UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:20-cv-24462

ALEJANDRO MUGABURU,

    Plaintiff,

vs.

AKIMA GLOBAL SERVICES, LLC;
DEPARTMENT OF HOMELAND
SECURITY; and U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT,

    Defendants.

_____/

**COMPLAINT**

    Plaintiff Alejandro Mugaburu ("Mugaburu"), sues Defendants Akima Global Services, LLC ("AGS"), Department of Homeland Security ("DHS"), and U.S. Immigration and Customs Enforcement ("ICE"), individually and alleges the following:

**INTRODUCTION**

    1.    In July 2019, Mugaburu was placed in ICE's custody. During an initial appointment with a medical professional, Mugaburu reported his condition of epilepsy, as well as other chronic ailments including cardiovascular, cholesterol, and blood pressure problems, among others in his medical history. Although the medical professional noted his conditions, Mugaburu was denied his daily medications.

    2.    Despite his pleas, Mugaburu was not given his required epilepsy medication for three days. On the evening of September 14, 2019, as he was descending a flight of stairs, a feeling of uneasiness and vertigo crept over him, and he subsequently suffered an epileptic attack.

Mugaburu tumbled down a flight of fourteen stairs and sustained injuries that left him temporarily unconscious and unable to walk. Since the moment of the accident, Mugaburu has been in persistent, unbearable pain and has experienced constant swelling in his legs, all of which now bind him to a wheelchair. The injuries he suffered as a result of the attack remain largely untreated, and Mugaburu continues to endure agonizing pain that permeates every facet of his daily life.

3. The injustices that Mugaburu suffered are not limited to a handful of instances—they traverse a period of consecutive months that evolve into a settled pattern of discrimination based on his disability. Protocols set in place to protect individuals with disabilities were broadly breached by DHS officials. Not only was Mugaburu denied his required medications on one occasion, but such an incident occurred habitually throughout ICE's custody of Mugaburu.

4. In fact, Mugaburu was placed in a second story sleeping quarters and given a top bunk—a breach of the policy that requires first floor, bottom bunk placements for disabled detainees. In the course of months, he was transported to various facilities, where the vehicles used to transport him did not have wheelchair lifts.

5. Medical professionals consistently ignored his various requests for attention to injuries and medication. He was placed in isolation for periods of consecutive weeks to limit the necessity for wheelchair mobility. He was denied access to bathing with a medical shower chair and was forced to use bathrooms and facilities that were not equipped for wheelchair access. The physical pain Mugaburu feels falls short compared to the pain of injustice.

6. The sequence of events involving mistreatment and discrimination on the basis of Mugaburu's disability by ICE, DHS, and AGS violates the Rehabilitation Act of 1973, the American with Disabilities Act, the Federal Tort Claims Act, and the Constitution. With the hope of restoring Mugaburu's sense of humanity, we file this action.

## PARTIES

1. Plaintiff Mugaburu is an individual who resides in Miami, Florida and is subject to the jurisdiction of this Court.

2. Defendant DHS is an executive agency with the responsibility of enforcing the immigration laws of the United States.

3. Defendant ICE is the sub-agency of DHS that is responsible for the detention and removal operations of DHS, including the transportation of immigrants between detention facilities.

4. Defendant AGS is a for profit company that is responsible for detention center management operations, health care services for detainees, training services, as well as records and data management.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1331 because the action arises under the Constitution and laws of the United States, pursuant to 28 U.S.C. §1346(b) because this action seeks to redress injury caused by the negligent or wrongful acts or omissions of employees of the United States government, and pursuant to 42 U.S.C. §1983 because this action seeks to redress harms caused by state officials in violation of the Constitution and laws of the United States. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§2201 and 2202.

6. This Court also has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343.

7. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over the state law claims asserted herein which are so related to the federal claims that they form part of the same case of controversy.

8. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS APPLICABLE TO ALL COUNTS

9. Mugaburu is a 34-year-old native and citizen of Peru.

10. When he was approximately six years old, Mugaburu began to have multiple episodes of seizures. At that young age, Mugaburu was formally diagnosed with epilepsy. Since his diagnosis, Mugaburu has depended on his daily required medication.

11. In September 2015, Mugaburu arrived in the United States on a B1/B2 visa.

12. Mugaburu has a father, two brothers, and two stepdaughters that reside in the United States, all of whom are U.S. citizens.

13. In 2017, for the first time in his life, Mugaburu was arrested following an incident with his ex-girlfriend. This incident resulted in his only arrest.

14. Although Mugaburu intended to fight his case and take it to trial, while he was detained at MetroWest Detention Center, he was viciously attacked on March 25, 2019.

15. As a result of the sudden attack, Mugaburu sustained various injuries, including a fractured arm, wounds to his shoulder and wrist, and loss of hearing in his right ear.

16. Because he feared for his life, Mugaburu agreed to a plea offered by the State of Florida in order to leave MetroWest. He subsequently accepted a withhold of adjudication on both charges and three years of probation.

17. After he accepted the plea deal, he was later transferred into ICE custody.

18. On July 11, 2019, Mugaburu entered ICE custody and was processed into Krome Detention Center ("Krome"). On that day, he reported his medical conditions to the registered nurse, Nelsaint Pierre, forthwith. He not only disclosed his epilepsy, but his cardiovascular,

cholesterol, asthma, and hypertension conditions. Mugaburu specifically stressed the urgency of having his daily medications, particularly his epilepsy medication—the anticonvulsant, Levetiracetam. He also noted other daily medications he took to treat his medical conditions, including Hydroxyzine, Rosuvastatin, and Venlafaxine, among others.

19. Upon the initial medical evaluation at detention centers, detainees with disabilities are to be given a "disability badge," which is a special form of identification for detainees with disabilities. The disability badge permits those persons with disabilities at the detention center to remain on the first floor's sleeping quarters and allows for bottom bunk sleeping arrangements in order to minimize the risk of injuries and falls.

20. Although Mugaburu reported his epilepsy and other medical conditions upon arrival at Krome, he was not given a disability badge. Mugaburu was assigned to top bunk sleeping arrangements and assigned second story sleeping quarters, despite the known potential dangers of housing detainees with epilepsy in higher floors.

21. After he learned of his sleeping arrangements, Mugaburu spoke with one of the guards and pleaded for a bottom bunk bed placement. At the time, Mugaburu had a broken arm from the injuries he had sustained while at MetroWest. The guard complied and said he would "do Mugaburu that favor" and switch him to a bottom bunk because of the fact that he had a broken arm. Mugaburu still remained in the second floor's sleeping quarters.

22. Mugaburu did not initially receive his required daily medications upon arrival at Krome. In particular, prior to September 14, 2019, he was subject to a period of three consecutive days without his epilepsy medication and seventeen days without any of the other medications he takes for his additional medical conditions.

23. Despite multiple requests, Mugaburu did not receive his required daily medication for epilepsy, Levetiracetam, or any other medication from September 11, 2019 through September 14, 2019.

24. On the evening of September 14, 2019 around dinner time, as Mugaburu was descending down the second-floor stairs, Mugaburu suddenly began to feel faint and feeble. In the brief moments to follow, Mugaburu abruptly became unconscious and tumbled down a flight of fourteen stairs.

25. The accident, which Mugaburu believes was a seizure induced by lack of medication, left him with significant injuries. The seizure caused him to lose consciousness for a period three hours, and he suffered multiple physical injuries as a result of the seizure-induced fall. In particular, he sustained injury to his left knee, which he still is not able to bend or walk on.

26. Mugaburu's mobility has been severely impaired since the time of the fall. While before the fall he was capable of walking normally, running, and exercising, he now requires the use of a wheelchair for maneuverability. Not only does he experience constant pain in his left knee, but his entire left leg is considerably swollen and hot to the touch. The severity of the pain since the time of accident interferes with his ability to sleep soundly at night and otherwise function normally throughout the day. The pain he currently still experiences interferes with his overall quality of life and is not only a source of physical pain, but emotional turmoil as well. Mugaburu never thought he would be dependent on a wheelchair at the ripe age of 34. His mental health since he began using the wheelchair has sharply declined, and he reports severe psychological repercussions as a result.

27. Following the accident on September 14, 2019, Mugaburu was taken in an ambulance to Kendall Regional Hospital. Among the treating physician's recommendations, she

included that Mugaburu should be given physical therapy, hot/cold treatment therapies, and muscle massages to treat the musculoskeletal pain resulting from the fall.

28. Despite these professional recommendations, Mugaburu would never receive the required therapy for his leg injuries. Mugaburu further reports that while at Kendall Regional Hospital, he was not treated for his leg injuries.

29. On September 15, 2019, he was discharged from the hospital despite feeling severe pain in his legs and not being able to walk.

30. Upon arrival at Krome Detention Center following the hospital discharge, Mugaburu was taken into Krome's Medical Housing Unit ("MHU"). Because Mugaburu was not able to walk properly, he was finally given a disability badge (despite the fact that he should have received one upon initial arrival at Krome with a diagnosis of epilepsy). Mugaburu would eventually stay in MHU until September 19, 2019. On information and belief, Mugaburu holds that officials kept him in MHU because Krome's other facilities were not wheelchair accessible.

31. While at MHU, Mugaburu reports that the medical staff would forcibly make him walk on his legs even though he had severe pain and could not stand properly. He was first given crutches, which the medical staff constantly pressed him to use. Mugaburu requested a wheelchair multiple times, citing pain from his broken arm which made it extremely difficult to use crutches. After many repeated requests for a wheelchair, Mugaburu was finally given one.

32. On September 19, 2019, Mugaburu was discharged from MHU and placed in "segregation"—a special unit that houses detainees in near-complete isolation from the general population of the detention center. For individuals in administrative segregation due to a special vulnerability, as is the case with Mugaburu, segregation "should be used only as a last resort and

when no other viable housing exists," according to DHS's website.[1]

33. Mugaburu remained in segregation for approximately two weeks, where he still did not have access to a wheelchair-accessible bathroom or other facilities accessible by wheelchair.

34. During his time in Krome, despite the previous accident that left him tragically injured, Mugaburu was left without medication for blocks of five consecutive days at a time. He reports that he would periodically request medication, and in the period between his request and receipt of his medication, five days would consistently lapse before he physically received medication.

35. At the beginning of February 2020, without any discernable reason, Mugaburu was transferred to Monroe County Detention Center ("Monroe") in Key West, FL.

36. Because the vehicle that was used to transport Mugaburu from Krome to Monroe was not wheelchair accessible, officials had to carry him onto the vehicle. The manner in which guards treated him, however, lacked any semblance of dignity or respect. In Mugaburu's own words, officials "threw [him] into the vehicle like a sack of potatoes." Such treatment left Mugaburu feeling humiliated and degraded, as other passengers on the vehicle quietly watched him being carried away by three guards.

37. While at Monroe, he was once again placed in second story sleeping quarters and was denied access to use a shower chair during his baths. Not only were the bathrooms not easily accessible with a wheelchair, but the refusal by his supervisors to give him a shower chair caused him to fall on one occasion, which further aggravated his injuries.

38. On or about March 7, 2020, after nearly one month in Monroe, Mugaburu was again transferred back to Krome, where he would remain for approximately another month.

---

[1] https://www.dhs.gov/publication/use-segregation-ice-detention (last visited 10.29.2020).

39. On or about April 3, 2020, Mugaburu was again inexplicably transferred from Krome to Glades Detention Center ("Glades") in Central Florida.

40. While at Glades, Mugaburu was faced with a situation that he was, unfortunately, already familiar with. Because the facilities at Glades were not wheelchair accessible, Mugaburu was placed in segregation once again for a period of 14 days.

41. Not only was he subjected to the mental and emotional anguish of isolation and confinement one feels in the small cell of the segregation unit, but he was once again denied his daily medication periodically, for periods of up to three consecutive days.

42. Mugaburu reports that, once again, the bathrooms at Glades were uncomfortable and inaccessible with a wheelchair, lacking in necessary structures for disabled individuals, such as a wheelchair ramp or grab bars.

43. On or about April 21, 2020, Mugaburu was once more transferred from Glades to Baker County Detention Center ("Baker") in North Florida without being given any apparent reason for the transfer.

44. Mugaburu stayed in Baker only seven days before he was transferred back to Krome on May 1, 2020. On May 7, 2020, Mugaburu was finally released from Krome.

45. At no point during any of his five transfers was a wheelchair-accessible vehicle used for Mugaburu. He reports that his arms and sides have bruises from the forceful grasps of the guards that carried him into the vehicles. Each time, Mugaburu felt the pangs of humiliation and degradation, as he was hoisted from vehicles like he was cargo—or anything but human, while other detainees on the vehicle watched the unnecessary spectacle.

46. In addition, throughout the time in which he was housed at the four different detention centers following his accident, Mugaburu was never provided with a bed equipped with

grab bars to help him transfer from his wheelchair to his bed. Furthermore, not a single bathroom in the four detention centers where he stayed had grab bars to facilitate showering, and at no point was Mugaburu provided with a medical shower chair despite his requests.

47. On September 11, 2020, DHS sent Mugaburu a letter in which it describes the grievances that Mugaburu reported during his time in ICE custody. DHS admits that it will formally "investigate complaints alleging violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794." *See* **Exhibit A**.

48. The letter further acknowledges that DHS was aware that Mugaburu was "improperly housed on the facility's second floor despite medical records that document [his] epilepsy." The letter further recounts that Mugaburu "had a seizure and fell on the stairs, causing injury."

49. The letter sent by DHS lists the "corrective action" that DHS plans to implement in light of the injustices that Mugaburu suffered. These include "facility staff training at Krome on the identification of detainees with special needs," distribution of "special needs passes," maintaining a "master list of detainees with special needs," the use of "color-coded wrist bracelets," and reviewing "local operating procedures . . ."

50. Although the letter by DHS has the benign intention to implement remedial future measures so that other detainees do not undergo the same injustices Mugaburu endured, it fails to address the entirety of the mistreatment, indignity, and mortification that Mugaburu suffered. It does not provide any direct personal redress for the physical and emotional anguish that DHS, ICE, and AGS subordinates subjected him to; the consequences of which he continues to suffer.

## **COUNT I—VIOLATION OF REHABILITATION ACT, 29 U.S.C. §794**
*(Against DHS, ICE, and AGS)*

51.     Plaintiff incorporates paragraphs 1 through 50 fully in this Count.

52.     Mugaburu's mobility disability and epilepsy, among other chronic medical conditions, constitute disabilities under the Rehabilitation Act because they substantially limit one or more major life activities.

53.     Mugaburu was "otherwise qualified" to participate in any of the activities or programs of the detention centers while in DHS, ICE, and AGS custody from 2019-2020.

54.     Defendant DHS, and its component, ICE, are executive agencies under 29 U.S.C. §794(a).

55.     Defendant, AGS, receives financial assistances from the federal government, including to operate "programs and activities" in order to efficiently manage detention centers and provide detainees with health services. 29 U.S.C. §794(b)(1)(A).

56.     DHS and ICE intentionally discriminated against Mugaburu on the basis of his disabilities, repeatedly denied his requests for reasonable and necessary accommodations for his disabilities, and cause Mugaburu serious physical pain, emotional distress, and humiliation, particularly in the transportation between detention centers. ICE acted intentionally, including with animus and/or deliberate indifference to the likelihood that Mugaburu's federally protected rights were being violated.

57.     AGS repeatedly denied Mugaburu the benefit of services and programs that other inmates without disabilities typically enjoyed, and intentionally discriminated against him on the basis of his disabilities despite Mugaburu's repeated requests for accommodations. AGS acted intentionally, including with animus and/or deliberate indifference to the likelihood that Mugaburu's federally protected rights were being violated.

58. DHS, ICE and AGS denied Mugaburu reasonable accommodations. The reasonable accommodations requested by Mugaburu would not have been unduly burdensome nor would they have required a significant alternation in the programs. 6 C.F.R. § 15.50(a)(2).

59. As a result of discrimination and failure to reasonable accommodate Mugaburu's special needs, and solely based on his disabilities, Mugaburu was kept from participating in, and denied the benefits of DHS, ICE and AGS programs and activities, including those related to his time in various detention centers.

WHEREFORE, based on the allegations on this Count I, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

## COUNT II – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
*(Against AGS)*

60. Plaintiff incorporates the allegations in paragraphs 1 through 50 fully in this Count.

61. Section 202 of the Americans with Disabilities Act ("ADA") stipulates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132.

62. A disability is "a physical or mental impairment that substantially limits one of more major life activities." 42 U.S.C. §12102(1), such as "caring for oneself, performing manual tasks . . . walking, standing, lifting, [and] bending." 42 U.S.C. §12102(2)(A).

63. Mugaburu's mobility disability and epilepsy, among other medical conditions, substantially limit one or more major life activities and therefore constitute a disability under the Americans with Disabilities Act. 42 U.S.C. §12102(1).

64. Mugaburu was "otherwise qualified" to participate in any of the activities or programs of the detention centers while in DHS, ICE, and AGS custody from 2019-2020.

65. A public entity includes an "instrumentality of a State or States or local government . . ." 42 U.S.C. §12131(1)(B). AGS, which is responsible for detention center management, health care, and operations and is federally funded, therefore falls within the meaning of a public entity.

66. AGS further provides services, programs, activities, facilities, and supervision of immigration detainees. Such facilities include bathrooms, bed spaces, and medical units, among others in detention centers.

67. AGS denied Mugaburu access to services, programs and activities that other detainees without special needs typically enjoy and, instead, isolated Mugaburu in MHU and Segregation units. This segregation from the general population of the detention center without special needs, in addition to repeatedly failing to provide wheelchair-accessible bathrooms and other facilities, and necessary medication despite repeated requests, constitutes a violation of the ADA. AGS acted intentionally, including with animus and/or deliberate indifference to the likelihood that Mugaburu's federally protected rights were being violated.

68. By segregating Mugaburu from the general population without special needs, AGS excluded Mugaburu from participating in, denied him benefits of, and subjected him to discrimination under a service, program or activity that required ADA compliance.

69. As a result of AGS's actions, Mugaburu suffered physical and emotional harm.

WHEREFORE, based on the allegations on this Count II, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

### COUNT III – FOURTEENTH AMEDNMENT, U.S.C. §1983
(*Against DHS, ICE, and AGS*)

70. Plaintiff incorporates the allegations in paragraphs 1 through 50 fully in this Count.

71. Detention center officials, medical professionals, and subordinates under DHS, ICE, and AGS kept Mugaburu in segregation away from the general population without justification or adequate process and denied access to his medication for significant periods of time. This conduct shocks the conscience and imposed an atypical and significant hardship on Mugaburu. These individuals violated Mugaburu's equal protection rights, procedural due process rights, and substantive due process, as guaranteed by the Fourteenth Amendment of the Constitution.

WHEREFORE, based on the allegations on this Count III, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

### COUNT IV – FIFTH AMENDMENT DUE PROCESS CLAUSE
*(Against ICE and DHS)*

72. Plaintiff incorporates the allegations in paragraphs 1 through 50 fully in this Count.

73. The Supreme Court has held that, in some circumstances, a person whose constitutional rights are violated by federal actors can sue those federal actors for damages. *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 397 (1971).

74. Detention center officials under the authority of DHS and ICE were deliberately indifferent to Mugaburu's grave medical needs, and therefore violated Mugaburu's rights under the Constitution to adequate medical care while incarcerated. Over the course of his months in detention, Mugaburu was denied the necessary medication for significant periods of time and denied proper mobility assistance during ICE transportation between detention centers.

75. As a result, Mugaburu suffered not only physical harm, but also humiliation and degradation.

WHEREFORE, based on the allegations on this Count IV, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

### COUNT V- FEDERAL TORT CLAIMS ACT, 28 U.S.C. §1346(b)- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Against DHS and ICE)*

76. Plaintiff incorporates the allegations in paragraphs 1 through 50 fully in this Count.

77. The tort of intentional infliction of emotional distress is recognized under Florida law. *Metropolitan Life Insurance Co. v. McCarson*, 467 So.2d 277 (Fla. 1985). To state a cause of action for intentional infliction of emotional distress, a Plaintiff must "allege four elements: 1) deliberate or reckless infliction of mental suffering; 2) outrageous conduct; 3) the conduct caused the emotional distress; and 4) the distress was severe. *Liberty Mt. Ins. Co. v. Steadman*, 968 So.2d 592, 594 (Fla. 2d DCA 2007).

78. ICE officials engaged in extreme and outrageous conduct in carrying out Mugaburu's transfer between detention centers on multiple occasions, from February through May 2020.

79. As a result of ICE officials' actions, Mugaburu suffered severe emotional distress, including degradation, humiliation, and worsening of his anxiety.

80. ICE officials intended to inflict emotional distress or knew or should have known that Mugaburu would experience severe emotional distress.

WHEREFORE, based on the allegations on this Count V, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

**COUNT VI- FEDERAL TORT CLAIMS ACT, 28 U.S.C. §1346(b)- NEGLIGENT SUPERVISION**
*(Against DHS, ICE, and AGS)*

81. Plaintiff incorporates the allegations in paragraphs 1 through 50 fully in this Count.

82. In Florida, negligent supervision occurs when "during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further actions such as investigation, discharge, or reassignment." *Acts Ret.-Life Communities, Inc. v. Estate of Zimmer,* 206 So. 3d 112, 114 (Fla. 4th DCA 2016).

83. DHS, ICE and AGS supervisors knew or should have known that their subordinates had the propensity to commit the torts that transpired.

84. On multiple occasions, Mugaburu alerted officials that he had not received his medication and, in fact, suffered a seizure that led to critical physical injuries that gravely impaired his mobility. As a result of the accident, DHS, ICE and AGS officials should have become aware of the unfitness of their subordinates in failing to provide Mugaburu with adequate medical care, medications, attention, and facilities to fit his special needs.

85. As a result of DHS, ICE and AGS's failure to supervise their employees, Mugaburu suffered injury, including significant physical and emotional harm.

WHEREFORE, based on the allegations on this Count VI, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

**COUNT VI- FEDERAL TORT CLAIMS ACT, 28 U.S.C. §1346(b)- NEGLIGENCE**
*(Against DHS, ICE, and AGS)*

86. Plaintiff incorporates the allegations in paragraphs 1 through 50 fully in this Count.

87. Under Florida law, negligence requires a showing of duty, breach, causation, and damages. *Miller By & Through Miller v. Foster*, 686 So. 2d 783, 783 (Fla. 4th DCA 1997).

88. DHS and ICE officials owed Mugaburu a duty of care as a result of them detaining him. 6 C.F.R. §15.30(a); 6 C.F.R. §15.50(a); *PBNDS* §1.3.

89. DHS and ICE officials breached the agencies' duty to Mugaburu by failing to provide inadequate transportation between detention centers, which forced him to be carried by officials as other passengers in the vehicle watched.

90. Mugaburu suffered physical harm as a result of being carried, as well as the emotional harm of degradation, humiliation, and exacerbation of his anxiety.

91. Moreover, AGS and ICE officials breached their duty of care to Mugaburu by failing to provide adequate accommodations upon his initial arrival at Krome. Because of Mugaburu's epilepsy, he should have been housed in a first-floor unit and assigned a bottom bunk sleeping placement.

92. The failure of AGS and ICE employees in complying with their duty of care to adequately oversee Mugaburu's special needs resulted in a tragic accident that now impairs his ability to walk and causes him significant physical pain.

93. In addition, AGS, DHS, and ICE officials breached their duty of care to Mugaburu by failing to provide his required daily medications on various occasions in multiple detention centers. On one occasion, the failure to provide Mugaburu with medications caused him to have a seizure, which resulted in considerable injuries that now bind him to a wheelchair for mobility.

94. As a result of DHS, ICE and AGS's breach of their duties of care, Mugaburu suffered both physical and emotional injury.

WHEREFORE, based on the allegations on this Count VI, Mugaburu requests:

(a) Judgment for compensatory damages;

(b) Judgment for exemplary damages;

(c) Cost of suit;

(d) Reasonable attorney's fees, pursuant to 42 U.S.C. §1988;

(e) Trial by jury as to all issues so triable; and

(f) Such other relief as this Honorable Court may deem just and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: October 29, 2020

        Respectfully submitted,

        Eduardo A. Maura, Esq.
        Luis F. Quesada, Esq.
        *Attorneys for Plaintiff*
        **Ayala Law, P.A.**
        2490 Coral Way, Ste 401
        Miami, FL 33145
        305-570-2208
        Email: eayala@ayalalawpa.com

        By: */s/ Eduardo A. Maura*
            Eduardo A. Maura
            Florida Bar No. 91303